**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NBA PROPERTIES, INC., MLB | ) | |
| ADVANCED MEDIA, L.P., MAJOR | ) | |
| LEAGUE BASEBALL PROPERTIES, INC., | ) | Case No. 13-cv-8870 |
| NHL ENTERPRISES, L.P., COLLEGIATE | ) | |
| LICENSING COMPANY, LLC, THE | ) | |
| BOARD OF THE TRUSTEES OF THE | ) | |
| UNIVERSITY OF ALABAMA, for and on | ) | |
| behalf of The University of Alabama, and | ) | |
| BOARD OF REGENTS OF THE | ) | |
| UNIVERSITY OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE PARTNERSHIPS and | ) | |
| UNINCORPORATED ASSOCIATIONS | ) | |
| IDENTIFIED ON SCHEDULE "A," | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiffs NBA Properties, Inc. ("NBAP"), MLB Advanced Media, L.P. ("MLBAM"), Major League Baseball Properties, Inc. ("MLBP"), NHL Enterprises, L.P. ("NHLE"), Collegiate Licensing Company, LLC ("CLC"), The Board of Trustees of the University of Alabama, for and on behalf of the University of Alabama ("UA Board of Trustees"), and Board of Regents of the University of Oklahoma ("OU Board of Regents"), collectively "Plaintiffs," hereby bring the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants") and allege as follows:

## I. JURISDICTION AND VENUE

1.     This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq., 28 U.S.C. § 1338(a) and (b), and 28 U.S.C. § 1331.  This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in Illinois and causes harm to Plaintiffs' businesses within this Judicial District.  Through at least the fully interactive commercial Internet websites operating under the Defendant Domain Names identified in Schedule A attached hereto (collectively, the "Defendant Internet Stores"), each of the Defendants has targeted and continues to target sales from Illinois residents by operating online stores that offer for sale products bearing one or more counterfeit versions of Plaintiffs' trademarks to residents of Illinois, offer shipping to Illinois, and accept payment in U.S. dollars.  Accordingly, each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiffs substantial injury in the State of Illinois.

## II. INTRODUCTION

3.     This action has been filed by Plaintiffs to combat online counterfeiters who trade upon Plaintiffs' reputation and goodwill by selling and/or offering for sale unlicensed and counterfeit products featuring one or more of the trademarks owned and/or licensed by the Plaintiffs (the "Counterfeit Products").  Defendants create the Defendant Internet Stores by the

2

thousands and design them to appear to be selling licensed products featuring one or more of the trademarks owned and/or licensed by Plaintiffs, while, upon information and belief, actually selling low-quality, unlicensed Counterfeit Products to unknowing consumers who make purchases from the Defendant Internet Stores. Many of the Defendant Internet Stores sell products including counterfeit versions of multiple trademarks owned and/or licensed by each of the Plaintiffs. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope of their counterfeiting operation. Plaintiffs are forced to file this action to combat Defendants' counterfeiting of the registered trademarks owned or licensed by the Plaintiffs, as well as to protect unknowing consumers from purchasing low-quality Counterfeit Products over the Internet. Plaintiffs have been irreparably harmed and continue to be irreparably damaged through consumer confusion, dilution, and tarnishment of their valuable trademarks as a result of Defendants' actions and seek injunctive and monetary relief.

## III. THE PARTIES

**The Plaintiffs**

**NBA Properties, Inc.**

4.      Plaintiff NBAP is a corporation duly organized and existing under the laws of the State of New York with its principal place of business at 645 Fifth Avenue, New York, New York.

5.      The National Basketball Association ("NBA") is an unincorporated association and professional basketball league, comprised of thirty (30) member teams ("NBA Teams"), including the Chicago Bulls, that provide professional basketball entertainment services and that collectively own NBAP. NBAP manages trademark affairs, including licensing and enforcement, for the NBA and NBA Teams.

6.     NBAP is the owner and/or the exclusive licensee of the famous and distinctive trademarks of the NBA and the NBA Teams, and is authorized to enforce the rights in those trademarks.  NBAP commercially exploits, protects and enforces rights in the famous and distinctive trademarks, names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with the NBA and the NBA Teams (collectively, the "NBA Trademarks"), including, but not limited to, those that are the subject of valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office and those that NBAP and the NBA Teams have adopted and used in commerce throughout the United States, including in Illinois.  NBAP owns more than one hundred fifty (150) United States Federal Trademark Registrations in a variety of classes and for a variety of different goods and services, including, without limitation, many for apparel, such as jerseys, shirts, caps, and other products in international class 25.  Among the NBA Trademarks owned by NBAP and registered before the United States Patent and Trademark Office are the word mark "NBA" (reg. no. 1,833,902) and the NBA Player Silhouette Logo:  (reg. no. 1,966,924). A partial list of the famous and distinctive NBA Trademarks owned by NBAP, registered before the United States Patent and Trademark Office, and currently in use in commerce includes the following:

| Registration | Trademark | Goods and Services |
|---|---|---|
| 1,833,902 | NBA | FOR: CLOTHING, NAMELY, HOSIERY, FOOTWEAR, SWEAT SHIRTS, SWEATPANTS, PANTS, TANK TOPS, JERSEYS, SHORTS, PAJAMAS, SPORT SHIRTS, RUGBY SHIRTS, BELTS, TIES, NIGHTSHIRTS, HATS, WARM-UP SUITS, JACKETS, PARKAS, COATS, CLOTH BIBS, HEAD BANDS AND WRIST BANDS IN CLASS 025. |

| 2,183,983 | NATIONAL BASKETBALL ASSOCIATION | FOR: CLOTHING, NAMELY, HOSIERY, FOOTWEAR, T-SHIRTS, SWEATSHIRTS, SWEATPANTS, PANTS, TANK TOPS, JERSEYS, SHORTS, PAJAMAS, SPORT SHIRTS, RUGBY SHIRTS, SWEATERS, BELTS, TIES, NIGHTSHIRTS, HATS, WARM-UP SUITS, JACKETS, PARKAS, COATS, CLOTH BIBS, HEAD BANDS, WRIST BANDS, APRONS, BOXER SHORTS, SLACKS, CAPS, EAR MUFFS AND GLOVES IN CLASS 025. |
|---|---|---|
| 2,157,039 |  | FOR: CLOTHING, NAMELY, HOSIERY, FOOTWEAR, SWEAT SHIRTS, SWEATPANTS, PANTS, TANK TOPS, JERSEY, SHORTS, PAJAMAS, SPORT SHIRTS, RUGBY SHIRTS, SWEATERS, BELTS, TIES, NIGHTSHIRTS, WARM-UP SUITS, PARKAS, COATS, CLOTH BIBS, HEAD BANDS AND WRIST BANDS IN CLASS 025. |
| 1,525,782 |  | FOR: HOSIERY, FOOTWEAR, T-SHIRTS, SWEAT SHIRTS, TANK TOPS, PAJAMAS, SPORT SHIRTS, BELTS, NIGHTSHIRTS, STOCKING CAPS, WARM-UP OR JOGGING SUITS, JACKETS, BIBS, HEAD BANDS AND WRIST BANDS IN CLASS 025. |
| 2,079,493 |  | FOR: CLOTHING, NAMELY, HOSIERY, FOOTWEAR, SWEAT SHIRTS, SWEATPANTS, PANTS, TANK TOPS, JERSEYS, SHORTS, PAJAMAS, SPORT SHIRTS, RUGBY SHIRTS, SWEATERS, BELTS, TIES, NIGHTSHIRTS, WARM-UP SUITS, PARKAS, COATS, CLOTH BIBS, HEAD BANDS AND WRIST BANDS IN CLASS 025. |
| 1,966,924 |  | FOR: CLOTHING, NAMELY HOSIERY, FOOTWEAR, T-SHIRTS, SWEAT SHIRTS, SWEATPANTS, PANTS, TANK TOPS, JERSEYS, SHORTS, PAJAMAS, SPORT SHIRTS, RUGBY SHIRTS, SWEATERS, BELTS, TIES, NIGHTSHIRTS, HATS, WARM-UP SUITS, JACKETS, PARKAS, COATS, CLOTH BIBS, HEAD BANDS, WRIST BANDS, APRONS, BOXER SHORTS, SLACKS, CAPS, EAR MUFFS, |

| | | AND GLOVES IN CLASS 025. |
|---|---|---|

True and correct copies of the above Federal Trademark Registrations for NBA Trademarks are attached hereto as **<u>Exhibit 1</u>**.

7.      The NBA brand of professional basketball and NBA Trademarks are widely known to and enormously popular with both sports fans and the general public.  NBAP has promoted and advertised the NBA, the NBA Teams and NBA Trademarks extensively for many years.  NBA Trademarks are among the most renowned and immediately recognizable marks in professional sports today.  As a result of substantial advertising, promotion and media attention, and NBAP's extensive licensing and sponsorship program for a wide variety of goods and services, NBA Trademarks have acquired secondary meaning and represent significant goodwill of great value to NBAP, the NBA and the NBA Teams.

8.      Hundreds of millions of fans have attended NBA games and related events, enjoyed television and radio broadcasts of NBA games and related events, and purchased merchandise bearing NBA Trademarks to identify with their favorite NBA Teams.  Millions visit <NBA.com>, the official NBA website, as well as the official websites of the individual NBA Teams, which prominently display, and in many cases are accessed by domain names containing, NBA Trademarks.

9.      A significant aspect of NBAP's business and resulting revenues has been for many years, and continues to be, the merchandising and licensing of NBA Trademarks.  NBAP has entered into numerous licensing agreements in the United States and around the world, authorizing use of NBA Trademarks on a wide variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "NBA Products").  Retail sales of NBA Products exceeded $1 billion in 2012.

6

10.  NBAP, directly and through authorized licensees, has established and maintains high standards of quality for NBA Products, and continues to maintain stringent quality control over licensees and other authorized users of NBA Trademarks.

11.  In supervising licensees, NBAP provides licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of NBA Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality.  All NBA Products are reviewed under these strict quality control procedures.

12.  As a result of the extensive use of NBA Trademarks, not only in connection with the NBA's well-known basketball games and related events, but also in connection with a wide variety of licensed merchandise promoted, sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique identifiers and synonyms in the public mind for NBAP and its affiliated and related NBA Teams.  As a result, NBA Trademarks are famous and possess significant goodwill of great value to NBAP and its affiliated and related NBA Teams.

13.  To protect NBA Trademarks from infringement, dilution, disparagement, and misappropriation, NBAP, in collaboration with the Coalition to Advance the Protection of Sports logos ("CAPS"), has established a comprehensive program of trademark protection, including regularly investigating suspicious websites identified in proactive Internet sweeps and reported by consumers.

**MLB Advanced Media, L.P. and Major League Baseball Properties, Inc.**

14.     MLBAM is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 75 Ninth Avenue, New York, New York 10011. Its general partner is MLB Advanced Media, Inc., a Delaware corporation with its principal place of business at 75 Ninth Avenue, New York, New York 10011.

15.     MLBAM is the Internet and interactive media company of Major League Baseball. MLBAM was established following a unanimous vote by the owners of the 30 Major League Baseball clubs (the "MLB Clubs") to centralize the Internet and interactive media operations of Major League Baseball.  MLBAM manages and operates the official Major League Baseball site, <MLB.com>, and each of the official MLB Club sites (e.g., <cubs.com> and <whitesox.com>) to create the most comprehensive Major League Baseball resource on the Internet.

16.     MLBP is a New York corporation with its principal place of business at 245 Park Avenue, New York, New York 10167.

17.     MLBP is indirectly owned by the MLB Clubs, and is a licensee of, and acts as agent for, the MLB Clubs, the Office of the Commissioner of Baseball and their affiliates and related entities (collectively, with MLBAM and MLBP, the "MLB Entities") with respect to a variety of matters including the licensing and protection of the MLB Clubs' trademarks (including those of the Chicago Cubs and Chicago White Sox) throughout the world.

18.     Pursuant to agreements among the MLB Entities, MLBAM and MLBP (collectively, "MLB") are the owners and/or the exclusive licensees of the famous and distinctive trademarks of the MLB Entities, and are authorized to enforce the rights in those trademarks.

8

19.     MLB commercially exploits, protects and enforces rights in the famous and distinctive trademarks, names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with the MLB Entities (collectively, the "MLB Trademarks"), including, but not limited to, those that are the subject of valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office and those that the MLB Entities have adopted and used in commerce throughout the United States, including in Illinois.  The MLB Entities own more than one hundred fifty (150) United States Federal trademark registrations in a variety of classes and for a variety of different goods and services, including, without limitation, many for apparel, such as jerseys, shirts, caps, and other products in international class 25.  Among MLB Trademarks are the word mark "MAJOR LEAGUE BASEBALL" (reg. no. 1,620,020) and the MLB silhouette logo:  (reg. no. 1,617,698).  A non-exhaustive list of the famous and distinctive MLB Trademarks owned by certain MLB Entities, registered before the United States Patent and Trademark Office, and currently in use in commerce, include the following:

| Registration Number | Trademark | Goods and Services |
| --- | --- | --- |
| 1,617,698 | MAJOR LEAGUE BASEBALL | FOR: CLOTHING, NAMELY, SHIRTS, SHORTS, DRESSES, SOCKS, UNDERWEAR, JACKETS, SWEATERS, PANTS, VISORS, CAPS, BIBS, INFANTWEAR, NAMELY, BABY SHORTS SETS, ROMPER SETS, BABY PANTS, COVERALLS; OUTERWEAR, NAMELY, UNIFORMS AND PULLOVERS, TIES, ROBES AND LOUNGEWEAR, SWEATSHIRTS, KNITTED HEADWEAR, HOSIERY, WRISTBANDS, ROBES, AND SHOES IN CLASS 025. |

| 1,620,020 | MAJOR LEAGUE BASEBALL | FOR: CLOTHING, NAMELY, SHIRTS, SHORTS, DRESSES, SOCKS, UNDERWEAR, JACKETS, SWEATERS, PANTS, VISORS, CAPS, BIBS, INFANTWEAR, NAMELY, BABY SHORTS SETS, ROMPER SETS, BABY PANTS, COVERALLS; OUTERWEAR, NAMELY, UNIFORMS AND PULLOVERS, TIES, ROBES AND LOUNGEWEAR, SWEATSHIRTS, KNITED HEADWEAR, HOSIERY, WRISTBANDS, ROBES AND SHOES IN CLASS 025. |
|---|---|---|
| 2,779,958 | MLB | FOR CLOTHING, NAMELY, CAPS, HATS, VISORS, KNITTED HEADWEAR, HEADBANDS, SHIRTS T-SHIRTS, TANK TOPS, SWEATERS, TURTLENECKS, PULLOVERS, VESTS, SHORTS, PANTS, DRESSES, BASEBALL UNIFORMS, JERSEYS, SWEATSHIRTS, SWEATPANTS, UNDERWEAR, BOXER SHORTS, SLEEPWEAR, JACKETS, CLOTH BIBS, INFANTWEAR, INFANT DIAPER COVERS, CLOTH DIAPER SETS WITH UNDERSHIRT AND DIAPER COVER, JUMPERS, ROMPERS, COVERALLS, CREEPERS, BABY BOOTIES, TIES, WRISTBANDS, SCARVES, SOCKS, HOSIERY IN CLASS 025. |

True and correct copies of the above Federal trademark registrations for MLB Trademarks are attached hereto as **Exhibit 2**.

20.    The MLB Trademarks are widely known to and enormously popular with both sports fans and the general public.  MLB has promoted and advertised the MLB Clubs, games between the MLB Clubs, related events, and MLB Trademarks extensively for many years. MLB Trademarks are among the most renowned and immediately recognizable marks in professional sports today.  As a result of substantial advertising, promotion and media attention,

10

and MLB's extensive licensing and sponsorship program for a wide variety of goods and services, MLB Trademarks have acquired secondary meaning and represent significant goodwill of great value to the MLB Entities.

21.     Hundreds of millions of customers have attended games between the MLB Clubs and related events, enjoyed television and radio broadcasts of games between the MLB Clubs and related events, and purchased merchandise bearing MLB Trademarks to identify with their favorite MLB Clubs.   Millions visit <MLB.com>, the official MLB website, as well as the official websites of the individual MLB Clubs, which prominently display, and in many cases are accessed by domain names containing, MLB Trademarks.

22.     A significant aspect of MLB's business and resulting revenues has been for many years, and continues to be, the merchandising and licensing of MLB Trademarks.   MLB has entered into numerous licensing agreements in the United States and around the world, authorizing use of MLB Trademarks on a wide variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "MLB Products"). Retail sales of MLB Products exceeded $1 billion in 2012.

23.     MLB, directly and through authorized licensees, has established and maintained high standards of quality for MLB Products, and continues to maintain stringent quality control over licensees and other authorized users of MLB Trademarks.

24.     In supervising licensees, MLB provides licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of MLB Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality.   All MLB Products are reviewed under these strict quality control procedures.

25.     As a result of the extensive use of MLB Trademarks, not only in connection with well-known baseball games between the MLB Clubs and related events, but also in connection with a wide variety of licensed merchandise promoted, sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique identifiers and synonyms in the public mind for MLB and its affiliated and related MLB Clubs.  As a result, MLB Trademarks are famous and possess significant goodwill of great value to MLB and its affiliated and related MLB Clubs.

26.     To protect MLB Trademarks from infringement, dilution, disparagement, and misappropriation, MLB, in collaboration with CAPS, has established a comprehensive program of trademark protection, including regularly investigating suspicious websites identified in proactive Internet sweeps and reported by consumers.  MLBP and MLBAM manage these activities on behalf of MLB.

**NHL Enterprises L.P.**

27.     Plaintiff NHLE is a Delaware limited partnership having a principal place of business at 1185 Avenue of the Americas, New York, New York.

28.     The National Hockey League ("NHL") is an unincorporated association, not for profit, organized as a joint venture to operate a professional ice hockey league consisting of thirty (30) member clubs (the "NHL Teams"), including the 2013 Stanley Cup Champion Chicago Blackhawks.  The NHL has existed since 1917 and has consistently attracted a large public following, both in the United States and worldwide.

29.      NHLE is the exclusive national United States licensee of the famous and distinctive trademarks of the NHL (including names, logos, symbols, emblems, uniform designs,

uniform trade dress colors, and other identifying indicia associated with the NHL)("NHL League Trademarks") and is authorized by the NHL to enforce the rights in the NHL League Trademarks.  In addition, NHLE is the exclusive national United States licensee of the famous and distinctive trademarks of the NHL Teams collectively (including names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with the NHL Teams) ("NHL Team Trademarks," and, together with the "NHL League Trademarks," the "NHL Trademarks").  NHLE is authorized by the NHL Teams to enforce the rights in the NHL Team Trademarks.  The NHL Trademarks include but are not limited to, those that are the subject of valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office and those that the NHL and the NHL Teams have adopted and used in commerce throughout the United States, including in Illinois.  In particular, NHLE is the exclusive United States licensee of and is authorized to enforce over one hundred (100) United States Federal Trademark Registrations for NHL League Trademarks in a variety of classes and for a variety of different goods and services, including, without limitation, for apparel such as jerseys, shirts, caps, and other products in international class 25.  Among the NHL League Trademarks are the word mark "NHL" (reg. no. 1,962,135) and the NHL Logo:

 (reg. no. 3,248,499).  A non-exhaustive list of the NHL League Trademarks, registered with the United States Patent and Trademark Office and currently in use in commerce, includes the following:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 3,248,499 |  | FOR: CLOTHING, NAMELY, BANDANNAS, BEACH COVER-UPS, BELTS, BODY SUITS, BOXER SHORTS, CAPS, CLOTH BIBS, COATS, DRESSES, FOOTWEAR, EAR MUFFS, GLOVES, HATS, HEADBANDS, HOSIERY, HOUSECOATS, JACKETS, JERSEYS, LEGGINGS, LEOTARDS, MITTENS, NIGHTSHIRTS, PAJAMAS, PANTS, RAIN COATS, RAIN WEAR, ROBES, SCARVES, SHIRTS, SHORTS, SKIRTS, SOCKS, SUITS, SUN VISORS, SUSPENDERS, SWEATERS, SWEATPANTS, SWEATSHIRTS, SWIMSUITS, SWIM TRUNKS, T-SHIRTS, TIES, TOQUES, UNDERWEAR, VESTS, WARM-UP SUITS AND WRISTBANDS IN CLASS 025. |
| 1,962,135 | **NHL** | FOR: CLOTHING, NAMELY, SHIRTS, JERSEYS, SWEATERS, JACKETS, SWEATSHIRTS, T-SHIRTS, PANTS, SWEATPANTS, WARM-UP SUITS, WRISTBANDS, HEADBANDS, SHORTS, CAPS, HATS, SOCKS, NIGHTSHIRTS, SCARVES, MITTENS AND CLOTH BIBS IN CLASS 025. |
| 1,678,612 |  | FOR: CLOTHING AND FOOTWEAR; NAMELY, JERSEYS, SWEATERS, JACKETS, SWEATSHIRTS, T-SHIRTS, SWEATPANTS, SHIRTS, CAPS, HATS AND SCARVES IN CLASS 025. |
| 2,422,903 | **STANLEY CUP** | FOR: CLOTHING, NAMELY, CAPS, CLOTH BIBS, HATS, JACKETS, JERSEYS, SHIRTS, SHORTS, SWEATERS, SWEATPANTS, SWEATSHIRTS, T-SHIRTS, TIES, VESTS AND WARM-UP SUTIS IN CLASS 025. |

| | | FOR: CLOTHING, NAMELY, CAPS, CLOTH BIBS, HATS, JACKETS, JERSEYS, SHIRTS, SHORTS, SWEATERS, SWEATPANTS, SWEATSHIRTS, T-SHIRTS, TIES, VESTS AND WARM-UP SUITS IN CLASS 025. |
|---|---|---|
| 2,395,418 |  | |

True and correct copies of the above Federal Trademark Registrations for NHL League Trademarks are attached hereto as **Exhibit 3**.

30.    The NHL brand of professional hockey and NHL Trademarks are widely known to and enormously popular with both sports fans and the general public.  NHLE has promoted and advertised the NHL, the NHL Teams and NHL Trademarks extensively for many years. NHL Trademarks are among the most renowned and immediately recognizable marks in professional sports today.  As a result of substantial advertising, promotion and media attention, and NHLE's extensive licensing and sponsorship program for a wide variety of goods and services, NHL Trademarks have acquired secondary meaning and represent significant goodwill of great value to the NHL, NHLE and the NHL Teams.

31.    Millions of fans have attended NHL games and related events, enjoyed television and radio broadcasts of NHL games and related events, and purchased merchandise bearing NHL Trademarks to identify with their favorite NHL Teams.  Millions visit <NHL.com>, the official NHL website, as well as the official websites of the individual NHL Teams, which prominently display, and in many cases are accessed by domain names containing, NHL Trademarks.

32.    A significant aspect of NHLE's business and resulting revenues has been for many years, and continues to be, the merchandising and licensing of the NHL Trademarks. NHLE has entered into numerous licensing agreements in the United States, authorizing use of NHL Trademarks on a wide variety of products, including apparel, caps, jewelry, toys, furniture,

pennants, and bags, among others (collectively, "NHL Products"). Retail sales revenue in 2012 of NHL Products was in the hundreds of millions of dollars.

33. NHLE, directly and through authorized licensees, has established and maintained high standards of quality for NHL Products, and continues to maintain stringent quality control over licensees and other authorized users of NHL Trademarks.

34. In supervising licensees, NHLE provides licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of NHL Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality. All NHL Products are reviewed under these strict quality control procedures.

35. As a result of the extensive use of NHL Trademarks, not only in connection with the NHL's well-known hockey games and related events, but also in connection with a wide variety of licensed merchandise sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique identifiers and synonyms in the public mind for NHLE, the NHL, and the NHL Teams. As a result, NHL Trademarks are famous and possess significant goodwill of great value to the NHL, the NHL Teams and NHLE.

36. To protect NHL Trademarks from infringement, dilution, disparagement, and misappropriation, NHLE, in collaboration with CAPS, has established a comprehensive program of trademark protection, including regularly investigating suspicious websites identified in proactive Internet sweeps and reported by consumers.

**Collegiate Licensing Company, LLC**

37.     Plaintiff CLC is a Georgia limited liability company having its principal place of business at 1075 Peachtree Street, Suite 3300, Atlanta, Georgia 30309.

38.     Plaintiff CLC is a trademark licensing and enforcement agent that represents more than 190 colleges, universities, bowl games, and collegiate athletic conferences, including UA and OU.

39.     In addition to UA and OU, CLC is the trademark licensing agent for numerous other collegiate institutions including, without limitation, Louisiana State University, the University of Georgia, Oklahoma State University, the University of California Los Angeles, the University of Nebraska, the University of Notre Dame, Clemson University, West Virginia University, Auburn University, the University of Wisconsin, the University of Florida, Duke University, and the University of South Carolina (collectively, "Additional CLC University Clients") whose trademarks (the "Additional CLC Protected Trademarks") are used on Counterfeit Products without authorization and sold by one or more Defendants.  Although not named as Plaintiffs herein, the Additional CLC University Clients have been and continue to be damaged by the unauthorized trademark use of the Defendants, and CLC suffers harm and damages as a result of these actions.

40.     A significant aspect of CLC's business has been for many years, and continues to be, the licensing of famous collegiate trademarks including, but not limited to, the UA Trademarks [not defined until page 19] and the OU Trademarks [not defined until page 23], which are owned by Plaintiffs UA Board of Trustees and OU Board of Regents, respectively, as well as the Additional CLC Protected Trademarks (collectively, the "Collegiate Trademarks").  Indeed, the efforts of CLC together with the enormous popularity of the Collegiate Trademarks

create valuable licensing royalties that support a myriad of programs and operations of UA, OU, and the Additional CLC University Clients. CLC, on behalf of UA, OU and the Additional CLC University Clients, has entered into numerous trademark licensing agreements in the United States and around the world, authorizing use of famous Collegiate Trademarks on a wide variety of products, including jerseys, caps, other apparel, and many other products. As CLC generates revenues based upon the sale of licensed products, CLC is damaged by the sale of Counterfeit Products, which decreases sales of licensed Genuine Products and thus causes CLC significant financial and irreparable harm.

41.     The MLB Trademarks, the NBA Trademarks, the NHL Trademarks, the UA Trademarks [not defined until page 19], and the OU Trademarks [not defined until page 23] are hereinafter collectively referred to as Plaintiffs' Trademarks.

**Board of Trustees of the University of Alabama, for and on behalf of the University of Alabama**

42.     Plaintiff UA Board of Trustees, for and on behalf of The University of Alabama ("UA") is a public corporation and instrumentality of the State of Alabama organized and existing under the constitution and laws of the State of Alabama. The campus of UA has its principal place of business in Tuscaloosa, Alabama 35487. The governing body of UA is the UA Board of Trustees. The UA Board of Trustees oversees management of UA, including management of its trademark affairs.

43.     UA, Alabama's flagship educational institution, was founded in 1831, and is the oldest public university in the state of Alabama. UA offers a wide range of undergraduate, graduate and professional programs for its more than 30,000 students, and is consistently ranked as one of the top 50 public universities in the nation. In addition, UA's graduates include 15 Rhodes Scholars, 15 Goldwater Scholars, 9 Truman Scholars and one Portz Scholar.

44.     UA also has a long tradition of athletic excellence.  UA's football team began playing at the intercollegiate level in 1892 and has won fifteen national championships, most recently for the 2012-2013 season.  UA's football, basketball and baseball teams have won a combined forty-one Southeastern Conference championships.  UA's most famous athletic celebrity, Paul W. "Bear" Bryant, served as head football coach at UA from 1958 through 1982.  During that reign, Coach Bryant coached six national championship teams, was named national coach of the year three times, and was named Southeastern Conference coach of the year eight times. On November 28, 1981, Coach Bryant became the then winningest football coach in the history of college football, and retired after having won 323 games.

45.     The UA Board of Trustees, for the benefit of UA, is the owner of the famous and distinctive trademarks of UA, and is responsible for protecting those trademarks.  The UA Board of Trustees commercially exploits, protects and enforces rights in the famous and distinctive trademarks, names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with UA (collectively, the "UA Trademarks"), including, but not limited to, those that are the subject of valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office and those that the UA Board of Trustees has adopted and used in commerce throughout the United States, including in Illinois.  The UA Board of Trustees owns more than ten United States Federal Trademark Registrations in a variety of classes and for a variety of different goods and services, including, without limitation, many for apparel such as jerseys, shirts, caps, and other products in international class 25.  Among the UA Trademarks are the word mark "ROLL TIDE" (reg. no.

1,335,032) and the University of Alabama Logo:  (reg. no. 4,156,102).  A non-exclusive list of the famous and distinctive UA Trademarks owned by UA Board of Trustees and registered

before the United States Patent and Trademark Office, and currently in use in commerce include

the following:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 1,483,351 | UNIVERSITY OF ALABAMA | FOR: JERSEYS AND SWEATSHIRTS IN CLASS 025. |
| 4,156,102 |  | FOR: MEN'S, WOMEN'S AND CHILDREN'S CLOTHING, NAMELY, HATS, SOCKS, SHOES, SHIRTS, SHORTS, PANTS, JACKETS, JERSEYS, T-SHIRTS IN CLASS 025. |
| 4,298,328 |  | FOR: STUFFED ANIMALS, YO-YO'S, BASKETBALLS, GOLF BALLS, FOOTBALLS, TOY MODEL CARS AND PLANES, BORAD GAMES, CHRISTMAS TREE ORNGMAENTS; SNOW GLOBES IN CLASS 028. |
| 2,745,882 |  | FOR: MEN'S CLOTHING, NAMELY, HATS, SHIRTS, JERSEYS; WOMEN'S CLOTHING, NAMELY, SHORTS, SHIRTS, PANTS; CHILDREN'S CLOTHING, NAMELY, SOCKS, SHIRTS, PANTS, JACKETS IN CLASS 025. |
| 1,338,772 | CRIMSON TIDE | FOR: SHIRTS, T-SHIRTS, JERSEYS, SWEAT SHIRTS, SHORTS, BABY PANTS, INFANTS' JUMPERS, TIES, SOCKS AND CAPS IN CLASS 025. |
| 1,335,032 | ROLL TIDE | FOR: SHIRTS, T-SHIRTS, JERSEYS, JACKETS, SHORTS, SHOES, SOCKS AND CAPS IN CLASS 025. |
| 1,526,504 | BAMA | FOR: SLEEP SHIRTS, ROBES, SHIRTS, T-SHIRTS, TENNIS SHIRTS, LADIES' TOPS, JERSEYS, SWEAT SHIRTS, SWEAT PANTS, |

| | | | WARM-UP SUTIS, SWEATERS, BLAZERS, JACKETS, VESTS, SHORTS, CHILDREN'S CHEERLEADER OUTFITS CONSISTING OF A SKIRT AND TOP; BABY PANTS, INFANTS' JUMPERS, BIBS, TIES, SHOES, MITTENS, SCARVES, SOCKS, AND CAPS IN CLASS 025. |
|---|---|---|---|

True and correct copies of the above Federal Trademark Registrations for UA Trademarks are attached hereto as **Exhibit 4**.

46.     UA's intercollegiate football, basketball and other athletic teams (collectively, the "UA Teams") and the UA Trademarks are widely known to and enormously popular with both sports fans and the general public.  The UA Board of Trustees has promoted and advertised UA, the UA Teams and the UA Trademarks extensively for many years.  The UA Trademarks are among the most renowned and immediately recognizable marks in college sports today.  As a result of substantial advertising, promotion and media attention, and UA Board of Trustees' extensive licensing and sponsorship program for a wide variety of goods and services, the UA Trademarks have acquired secondary meaning and represent significant goodwill of great value to UA, the UA Board of Trustees and the UA Teams.

47.     Millions of fans have attended UA sports games and related events, enjoyed television and radio broadcasts of UA games and related events, and purchased merchandise bearing the UA Trademarks to identify with their favorite UA Team.  Thousands more visit <rolltide.com>, the official UA athletics website, which prominently displays the UA Trademarks.

48.     A significant aspect of the UA Board of Trustees' business and resulting revenues has been for many years, and continues to be, the merchandising and licensing of the UA

Trademarks. The UA Board of Trustees, in conjunction with its licensing agent CLC, has entered into numerous licensing agreements in the United States and around the world, authorizing use of the UA Trademarks on a wide variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "UA Products"). Retail sales revenue in 2012 of UA Products was in the tens of millions of dollars.

49. The UA Board of Trustees, directly and through authorized licensees, has established and maintained high standards of quality for UA Products, and continues to maintain stringent quality control over licensees and other authorized users of the UA Trademarks.

50. In supervising licensees, the UA Board of Trustees provides licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of the UA Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality. All UA Products and designs appearing thereon are reviewed under these strict quality control procedures.

51. As a result of the extensive use of the UA Trademarks, not only in connection with UA's well-known sports games, exhibitions and services, but also in connection with a wide variety of licensed merchandise promoted, sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning various diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique identifiers and synonyms in the public mind for UA and the affiliated and related UA Teams. As a result, the UA Trademarks are famous and possess significant goodwill of great value to UA, its affiliated and related UA Teams, and the UA Board of Trustees.

**The Board of Regents of the University of Oklahoma**

52.     Plaintiff OU Board of Regents is a constitutional state entity of the State of Oklahoma and created according to the Oklahoma state constitution, having its principal place of business at 660 Parrington Oval, Room 321, Norman, Oklahoma 73019-0390.  The OU Board of Regents oversees many aspects of the management of the University of Oklahoma ("OU"), including management of trademark affairs.

53.     OU, Oklahoma's flagship educational institution, was founded in 1890, and is one of the oldest public universities in the state of Oklahoma.  OU offers a wide range of undergraduate, graduate and professional programs for its more than 30,000 students, and is consistently ranked as one of the top 50 public universities in the nation.

54.     OU is home to one of the most storied intercollegiate athletics programs in the nation.  The OU Sooners ("Sooners") boast 27 national championships in men's and women's sports, including 7 national football championships, 258 team conference championships and more than 800 All-Americans.

55.     The OU Board of Regents is the owner of the famous and distinctive trademarks of OU, and is responsible for protecting those trademarks.  The OU Board of Regents commercially exploits, protects and enforces rights in the famous and distinctive trademarks, names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with OU (collectively, the "OU Trademarks"), including, but not limited to, those that are the subject of valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office and those that the OU Board of Regents has adopted and used in commerce throughout the United States, including in Illinois. The OU Board of Regents owns more than eighty (80) United States Federal Trademark

Registrations in a variety of classes and for a variety of different goods and services, including, without limitation, many for apparel such as jerseys, shirts, caps, and other products in international class 25. Among the OU Trademarks are the word mark "SOONERS" (reg. no. 3,041,006) and the Interlocking OU Logo:  (reg. no. 3,035,551).

56.     A non-exclusive list of the famous and distinctive OU Trademarks owned and/or licensed by the OU Board of Regents, registered before the United States Patent and Trademark Office, and currently in use in commerce include the following:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 1,378,171 |  | FOR: CLOTHING, NAMELY, ADULT AND CHILDREN'S JACKETS, SHIRTS, T-SHIRTS, SPORT SHIRTS, SWEAT SHIRTS, SWEAT PANTS, HATS, CAPS, AND VISORS IN CLASS 025. |
| 3,093,031 | BOOMER SOONER | FOR: CLOTHING AND SPORTS CLOTHING APPAREL AND OUTERWEAR, NAMELY T-SHIRTS, SHIRTS, SWEATERS, VESTS, SWEAT SHIRTS, JACKETS, PANTS, SWEATPANTS, SHORTS, HATS, CAPS, VISORS AND FOOTWEAR IN CLASS 025. |
| 3,035,551 |  | FOR: CLOTHING AND SPORTS CLOTHING APPAREL AND OUTERWEAR, NAMELY, T-SHIRTS, SHIRTS, SWEATERS, VESTS, SWEAT SHIRTS, JACKETS, PANTS, SWEATPANTS, SHORTS, HATS, CAPS, VISORS AND FOOTWEAR IN CLASS 025. |
| 3,041,006 | SOONERS | FOR: CLOTHING AND SPORTS CLOTHING APPAREL AND OUTERWEAR, NAMELY T-SHIRTS, SHIRTS, SWEATERS, |

| | | |
|---|---|---|
| | | VESTS, SWEAT SHIRTS, JACKETS, PANTS, SWEATPANTS, SHORTS, HATS, CAPS, VISORS AND FOOTWEAR IN CLASS 025. |
| 1,374,839 | **SOONERS** | FOR: CLOTHING, NAMELY, ADULT AND CHILDREN'S JACKETS, SHIRTS, T-SHIRTS, SPORT SHIRTS, SWEAT SHIRTS, SWEAT PANTS, HATS, CAPS, VISORS IN CLASS 025. |

True and correct copies of the above Federal Trademark Registrations for OU Trademarks are attached hereto as **Exhibit 5**.

57. OU's intercollegiate sports teams (collectively, the "OU Teams") and the OU Trademarks are widely known to and enormously popular with both sports fans and the general public. The OU Board of Regents has promoted and advertised OU, the OU Teams and the OU Trademarks extensively for many years. The OU Trademarks are among the most renowned and immediately recognizable marks in college sports today. As a result of substantial advertising, promotion and media attention, and the OU Board of Regents' extensive licensing and sponsorship program for a wide variety of goods and services, the OU Trademarks have acquired secondary meaning and represent significant goodwill of great value to OU and the OU Board of Regents.

58. Millions of fans have attended OU sports games and related events, enjoyed television and radio broadcasts of OU games and related events, and purchased merchandise bearing OU Trademarks to identify with their favorite OU Team. Thousands more visit <soonersports.com>, the official OU athletics website, which prominently displays the OU Trademarks.

59.     A significant aspect of the OU Board of Regents' business and resulting revenues has been for many years, and continues to be, the merchandising and licensing of the OU Trademarks.  The OU Board of Regents, in conjunction with its licensing agent CLC, has entered into numerous licensing agreements in the United States and around the world, authorizing use of the OU Trademarks on a wide variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "OU Products").  Retail sales revenue in 2012 of OU Products was in the tens of millions of dollars.

60.     The OU Board of Regents, directly and through authorized licensees, has established and maintained high standards of quality for OU Products, and continues to maintain stringent quality control over licensees and other authorized users of the OU Trademarks.

61.     In supervising licensees, the OU Board of Regents provides licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of the OU Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality.  All OU Products and designs appearing thereon are reviewed under these strict quality control procedures.

62.     As a result of the extensive use of the OU Trademarks, not only in connection with OU's well-known sports games, exhibitions and services, but also in connection with a wide variety of licensed merchandise sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning various diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique identifiers and synonyms in the public mind for OU and the affiliated and related OU Teams.  As a result, the OU Trademarks are famous and possess

significant goodwill of great value to OU, its affiliated and related OU Teams, and the OU Board of Regents.

**The Defendants**

63.     Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions.  Defendants conduct business throughout the United States, including within the State of Illinois and this Judicial District, through the operation of the fully interactive commercial websites operating under the Defendant Internet Stores.  Each Defendant targets Illinois residents and has offered to sell Counterfeit Products to consumers within the State of Illinois.

64.     On information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell products bearing counterfeit versions of many of Plaintiffs' Trademarks in the same transaction, occurrence, or series of transactions or occurrences.  Tactics used by Defendants to conceal their identities and the full scope of their counterfeiting operation make it virtually impossible for Plaintiffs to learn Defendants' true identities and the exact interworking of their massive counterfeit network.  In the event that Defendants and/or third party service providers provide additional credible information regarding the identities of Defendants, Plaintiffs will take appropriate steps to amend the Complaint.

### IV. DEFENDANTS' UNLAWFUL CONDUCT

65.     The fame of Plaintiffs' Trademarks and the success of Plaintiffs' respective athletic brands and affiliated variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "Plaintiffs' Genuine Products"), has resulted in significant counterfeiting of the trademarks owned by these entities.  TM Management Inc.

("TMMI") administers Coalition to Advance the Protection of Sports logos ("CAPS") on behalf of its members, MLBP, NHLE, NBAP, CLC and NFL Properties, LLC. CAPS has created an extensive anti-counterfeiting program, which includes regularly investigating suspicious websites identified in proactive Internet sweeps and reported by a variety of informants. Despite Plaintiffs' and CAPS' collective enforcement efforts, Defendants have persisted in creating the Defendant Internet Stores that Defendants use to promote, advertise, distribute, sell and/or offer for sale Counterfeit Products in order to generate massive profits for the Defendants.

66.     Defendants facilitate sales of Counterfeit Products by intentionally designing the Defendant Internet Stores so that they appear to unknowing consumers to be legitimate online retailers, outlet stores, or wholesalers selling products bearing the Plaintiffs' Trademarks under the premise that they are licensed by, or on behalf, of Plaintiffs. The Defendant Internet Stores sell Counterfeit Products purporting to emanate from multiple Plaintiffs. Plaintiffs' Genuine Products are very often sold in stores (both on the ground and on the Internet) that carry products from all of the Plaintiffs, and many of the Defendant Internet Stores attempt to exploit this by offering Counterfeit Products of multiple Plaintiffs. The Defendant Internet Stores look sophisticated and accept payment in U.S. dollars, even though they are based offshore. Numerous Defendant Domain Names also incorporate one or more of Plaintiffs' Trademarks into the domain name to make it very difficult for consumers to distinguish the counterfeit Defendant Internet Stores from a legitimate retailer selling Plaintiffs' Genuine Products. Upon information and belief, none of the Plaintiffs have licensed or authorized Defendants to use any of Plaintiffs' Trademarks, and, upon information and belief, none of the Defendants are legitimate resellers of any of Plaintiffs' Genuine Products.

67.     The Defendant Internet Stores accept payment via Western Union, credit card and/or PayPal and ship the Counterfeit Products to U.S. consumers in small quantities via the U.S. Postal Service or express consignment to minimize detection by U.S. Customs and Border Protection.  A 2012 U.S. Customs and Border Protection report on seizure statistics indicated that the Internet has fueled "explosive growth" in the number of small packages of counterfeit goods shipped through the mail and express carriers.  Defendants further perpetuate the illusion of legitimacy on the Defendant Internet Stores by falsely alleging to offer "live 24/7" customer service and making unauthorized use of indicia of authenticity and security that U.S. consumers have come to associate with legitimate retailers, including the McAfee® Security and VeriSign® trademarks.

68.     Upon information and belief, Defendants also deceive unknowing consumers by using one or more of Plaintiffs' Trademarks without authorization within the content, text, and/or meta-tags of their websites in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for one or more of Plaintiffs' Genuine Products.  Additionally, Defendants use other unauthorized search engine optimization (SEO) tactics to increase website rank.  As a result, links to Defendant Internet Stores show up at or near the top of popular search results when consumers use one or more of Plaintiffs' Trademarks to search for goods online and thereby deceive and misdirect consumers searching for one or more of Plaintiffs' Genuine Products.

69.     Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their massive network of Defendant Internet Stores.  Many of Defendants' names and addresses used to register the Defendant Domain Names are incomplete, contain randomly typed letters, or fail to include cities or states.

Other Defendant Domain Names use a privacy service that conceals the owner's identity and contact information. On information and belief, Defendants constantly register new Defendant Domain Names using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Domain Name registration patterns are one of many tactics used by the Defendants to conceal both their identities and the full scope and interworking of Defendants' massive counterfeiting operations.

70. Even though Defendants operate under multiple fictitious names, many similarities between the Defendant Internet Stores lead Plaintiffs to believe that there is a coordinated effort to sell Counterfeit Products. For example, many of the Defendant Internet Stores have virtually identical layouts, even though different aliases were used to register the respective domain names. Many of the Defendant Internet Stores sell counterfeit versions of products purporting to emanate from all of, or nearly all of, the Plaintiffs. In addition, the Counterfeit Products for sale in many of the Defendant Internet Stores bear the same or similar irregularities and/or indicia that identifies them as being counterfeit, suggesting that the Counterfeit Products were manufactured by and/or obtained from a common source and that Defendants are interrelated. The Defendant Internet Stores also include other notable common features, including use of the same domain name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, meta data, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, the same incorrect grammar and misspellings, and similar hosting services.

71. Defendants, without any authorization or license from any of the Plaintiffs, have knowingly and willfully used and continue to use one or more of Plaintiffs' Trademarks in connection with the advertisement, distribution, offering for sale, and/or sale of the Counterfeit

Products into the United States and Illinois over the Internet. Each Defendant Internet Store offers Counterfeit Products for sale to residents of Illinois and offers shipping of Counterfeit Products to Illinois residents.

72. Defendants' use of one or more of Plaintiffs' Trademarks in connection with the advertising, distribution, offering for sale and/or sale of Counterfeit Products, including to residents of Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiffs.

**COUNT I**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

73. Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 72.

74. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit or infringing imitations of one or more of Plaintiffs' Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. Plaintiffs' Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from Plaintiffs' respective products sold or marketed under Plaintiffs' Trademarks.

75. Defendants have sold, offered to sell, marketed, distributed and advertised, and are still selling, offering to sell, marketing, distributing and advertising products bearing counterfeit or infringing reproductions of one or more of Plaintiffs' Trademarks without Plaintiffs' permission or consent.

76. Upon information and belief, Defendants have knowledge of Plaintiffs' rights in Plaintiffs' Trademarks, and are willfully infringing and intentionally using counterfeits or infringements of one or more of Plaintiffs' Trademarks. Defendants' willful, intentional and

unauthorized use of one or more of Plaintiffs' Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the counterfeit or infringing goods among the general public.

77.     Defendants' unlawful activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

78.     Plaintiffs have no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their reputation and the goodwill of their well-known Plaintiffs' Trademarks.

79.     The injuries and damages sustained by Plaintiffs have been directly and/or proximately caused by Defendants' wrongful use, advertisement, offering to sell, and/or sale of the Counterfeit Products.

## COUNT II
### FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

80.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 79.

81.     Defendants' promotion, marketing, offering for sale and/or sale of the Counterfeit Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection or association with Plaintiffs, or as to the origin, sponsorship, or approval of Defendants' Counterfeit Products by Plaintiffs.

82.     By using one or more of Plaintiffs' Trademarks on the Counterfeit Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Products.

83.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

84.     Plaintiffs have no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their respective reputations and the goodwill of Plaintiffs and their respective Trademarks.

**COUNT III**
**CLAIM FOR INJUNCTIVE RELIEF UNDER THE ANTICYBERSQUATTING CONSUMER PROTECTION ACT (15 U.S.C. § 1125(d)) AS TO THE DEFENDANTS OPERATING A DEFENDANT DOMAIN NAME INCORPORATING THE PLAINTIFFS' TRADEMARKS**

85.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 84.

86.     Plaintiffs are the exclusive owners, legal representatives and/or exclusive licensees or licensing representatives of the Plaintiffs' Trademarks, and/or have been authorized to enforce rights in the Plaintiffs' Trademarks by the owners of the Plaintiffs' Trademarks. Plaintiffs' Trademark registrations are in full force and effect. Additionally, Plaintiffs' Trademarks are famous marks pursuant to 15 U.S.C. § 1125 and were famous before and at the time of the registration of the Defendant Domain Names.

87.     Upon information and belief, Defendants have acted with the bad faith intent to profit from the unauthorized use of one or more of Plaintiffs' Trademarks and the goodwill associated therewith by registering various domain names which are identical to, confusingly similar to or dilutive of one or more of Plaintiffs' Trademarks.

88.     Defendants have no intellectual property rights in or to any of Plaintiffs' Trademarks, and Plaintiffs have not consented to the use of Plaintiffs' Trademarks in the Defendant Domain Names.

89.     Defendants' actions constitute willful cybersquatting in violation of §43(d) of the Lanham Act, 15 U.S.C. §1125(d).

90.     Plaintiffs have no adequate remedy at law, and the registration and use of the Defendant Domain Names has caused, is causing, and is likely to continue to cause substantial and irreparable injury to the public and to Plaintiffs.

**COUNT IV**
**VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(815 ILCS § 510, et seq.)**

91.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 90.

92.     Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their products as those of one or more of the Plaintiffs, causing a likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with one or more of the Plaintiffs' Genuine Products, representing that their products have any or all of Plaintiffs' approval when they do not, and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

93.     The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510, et seq.

94.     Plaintiffs have no adequate remedy at law, and Defendants' conduct has caused Plaintiffs to suffer damage to their respective reputations and the goodwill of Plaintiffs and their

respective Trademarks. Unless enjoined by the Court, Plaintiffs will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1) That Defendants, their officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily and permanently enjoined and restrained from:

   a. using any of Plaintiffs' Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, promotion, marketing, advertising, distributing, offering for sale, or sale of any product that is not one of Plaintiffs' Genuine Products or is not authorized by Plaintiffs to be sold in connection with Plaintiffs' Trademarks;

   b. passing off, inducing, or enabling others to sell or pass off any products as Plaintiffs' Genuine Products or any other products produced by Plaintiffs that are not Plaintiffs', or not produced under the authorization, control or supervision of Plaintiffs and approved by Plaintiffs for sale under Plaintiffs' Trademarks;

   c. committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Plaintiffs, or sponsored or approved by, or connected with Plaintiffs;

   d. further infringing Plaintiffs' Trademarks and damaging Plaintiffs' goodwill;

   e. otherwise competing unfairly with Plaintiffs in any manner;

   f. shipping, delivering, importing, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or

inventory not manufactured by or for Plaintiffs, nor authorized by Plaintiffs to be sold or offered for sale, and which bear any of Plaintiffs' Trademarks, or any reproductions, counterfeit copies or colorable imitations thereof;

g. using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Internet Stores, the Defendant Domain Names or any other domain name that is being used to sell Counterfeit Products; and

h. operating and/or hosting the Defendant Internet Stores or any other websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, marketing, advertising, offering for sale, or sale of any product that is not Plaintiffs' Genuine Products or not authorized by Plaintiffs to be sold in connection with Plaintiffs' Trademarks; and

2) That Defendants, within fourteen (14) days after service of judgment with notice of entry thereof upon them, be required to file with the Court and serve upon Plaintiffs a written report under oath setting forth in detail the manner in which Defendants have complied with paragraph 1, a through h, supra;

3) Entry of an Order that the domain name registries for the Defendant Domain Names, namely VeriSign, Inc., Neustar, Inc., Afilias Limited and the Public Interest Registry, within two (2) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Plaintiffs' selection until further ordered by this Court, and that the domain name registrars take any steps necessary to transfer the Defendant Domain Names to a registrar of Plaintiffs' selection until further ordered by this Court;

4) Entry of an Order that, upon Plaintiffs' request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces such as iOffer, social media

platforms such as Facebook, YouTube, LinkedIn and Twitter, Internet search engines such as Google, Bing and Yahoo, web hosts, domain name registrars and domain name registries, shall:

    a.  disable and cease providing services for any accounts through which Defendants engage in the sale of Counterfeit Products using Plaintiffs' Trademarks, including any accounts associated with the Defendants listed on Schedule A;

    b.  disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of Counterfeit Products using Plaintiffs' Trademarks; and

    c.  Take all steps necessary to prevent links to the Defendant Domain Names identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Domain Names from any search index; and

5) That Defendants account for and pay to Plaintiffs all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged and that the amount of damages for infringement of Plaintiffs' Trademarks be increased by a sum not exceeding three times the amount thereof as provided by law;

6) In the alternative, that Plaintiffs be awarded statutory damages pursuant to 15 U.S.C. § 1117(c)(2) of two million dollars ($2,000,000.00) for each and every use of Plaintiffs' Trademarks and one hundred thousand dollars ($100,000.00) per domain name pursuant to 15 U.S.C. § 1117(d);

7) That Plaintiffs be awarded their reasonable attorneys' fees and costs; and

8) Award any and all other relief that this Court deems just and proper.

Dated this 12th day of December 2013.

Respectfully submitted,

___/s/ Justin R. Gaudio_____
Kevin W. Guynn
Amy C. Ziegler
Justin R. Gaudio
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080 / 312.360.9315 (facsimile)
kguynn@gbclaw.net
aziegler@gbclaw.net
jgaudio@gbclaw.net

*Attorneys for Plaintiffs*
*NBA Properties, Inc., MLB Advanced Media, L.P.,*
*Major League Baseball Properties, Inc., NHL*
*Enterprises, L.P., Collegiate Licensing Company,*
*LLC, The Board of Trustees of The University of*
*Alabama, for and on behalf of the University of*
*Alabama, and Board of Regents of The University*
*of Oklahoma*